98 So.2d 795 (1957)
Willie Andrew WELLS, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
December 11, 1957.
William Lamar Rose, Fort Myers, for appellant.
*796 Richard W. Ervin, Atty. Gen., and David U. Tumin, Asst. Atty. Gen., for appellee.
DREW, Justice.
Willie Andrew Wells was indicted by the Grand Jury of Charlotte County for murdering his wife, Gladys Jane Wells, by shooting her with a shotgun. The jury rendered a verdict of guilty without recommendation for mercy and the defendant Wells was sentenced to death by the trial court. The only question presented for our consideration in this appeal arises out of the plea of insanity interposed by the defendant.
Prior to the trial of the cause, the trial court entered an order as provided by Sec. 917.01, Florida Statutes 1955, F.S.A., appointing Dr. Ernest R. Bourkard and Dr. Mauricio Rubio as two disinterested qualified experts to examine the said Willie Andrew Wells and "to testify at the hearing thereon before this Court as to his mental condition." Such a hearing was conducted by the trial court although the record is silent as to what transpired at the hearing set by the order of the court. We infer from the testimony of Helen Wotitzky, clerk of the circuit court, a rebuttal witness for the State, that the trial court did conduct such a hearing and entered its order determining the defendant to be competent to stand trial and to assist in his defense. The trial court qualifiedly admitted the order in evidence but the record before us does not contain a transcript of the proceedings or the testimony that was adduced at the hearing. The pertinency of this observation will be apparent when we discuss the testimony of the psychiatrist.
The evidence establishes that the appellant on the night of March 3, 1956 killed his fifteen year old wife by shooting her with a shotgun after having told the deceased's uncle and aunt and several of her cousins that he had come to the scene to ask her a question and if she didn't answer it right, he was going to kill her. The fact of the murder is not challenged in this appeal so we need not concern ourselves with this phase of the evidence.
The defendant introduced in evidence in support of his plea of not guilty by reason of insanity a certified copy of proceedings in the county judge's court in Charlotte County in the summer of 1937 which resulted in an order by the county judge of that county finding Willie Andrew Wells, the appellant here, to be insane; finding that the insanity was schizophrenia, the cause being unknown and the particular hallucination being oppression and finding that the said Willie Andrew Wells required mechanical restraint to prevent the infliction of violence by him upon himself or other persons. It commanded that he be forthwith delivered to the superintendent of the Florida State Hospital. There is no record in the office of the county judge of Charlotte County to show that this order adjudging Wells to be insane has ever been revoked or set aside. Nor does the State contend that said order has been revoked. Moreover, the defendant produced as a witness in his behalf John Hagan who testified that he had known the defendant for between 30 and 35 years and that said defendant worked for him about three years. He testified that he was one of the committee that requested an examination of the defendant in 1937 for the purpose of determining his insanity. He was permitted to testify without objection that at times he thought the defendant was insane and at times he thought him sane. He said in answer to a question as to the actions of the defendant:
"A. Well, my association with him, he at times would get the idea that some individual would have it in for him and he'd seem at that time that he was unbalanced to me. Yet, he'd be just peculiar about it, when he'd have no reason to be. Probably the individual had never done nothing to him.
"Q. Now, on those occasions would you state in your opinion whether or not you would consider him dangerous? A. Well, *797 personally I was never afraid of the man myself but I think at the time if that particular individual, if he thought some individual had it in for him, he would have been dangerous to that individual."
It appears from the testimony of Mr. Hagan that sometime after the defendant was committed to the State Hospital (the date not being established) he returned to the community of Punta Gorda and had been around there for most of the time since. It is abundantly clear from the record in this case that the defendant's sanity has never been judicially restored to him. At least that is the only conclusion which either the trial court or this Court can reach from a careful examination of all of the evidence in this case, and we reiterate, it is not contended otherwise by the State.
Another factor of considerable importance in weighing the testimony of the psychiatrist, which we shall discuss later, is the testimony of several of the State's witnesses concerning an idiosyncrasy of the defendant which obviously had extended over the period of most of his life. These witnesses testified that the defendant was continually laughing. It is stated in the appellant's brief that he was known in the community as "laughing Willie". Although the record does not show this, the correctness of the statement is a logical inference from the testimony in the record. Travis Parnell, the jailer, testified that he had known him for more than 25 years. The following sequence of questions and answers are enlightening:
"Q. Now, when Willie was first turned over to you, the Monday after this Saturday night shooting, what was his personal demeanor, his appearance mentally and otherwise? A. Well, very little difference in him then and today.
"Q. Well, did he laugh and joke with you about it? A. Yes.
"Q. Laughed and joked with you? A. No, he didn't laugh and joke about that but he laughed and joked about everything else."
Mr. Lonus Whidden, a witness for the State, testified that he had known the defendant for about 30 years or a little longer and had been friendly with him over that period of time. A portion of his testimony is as follows:
"Q. Mr. Whidden, what was his condition and the expressions that he used on that occasion" Was he crying, upset? A. Well, about the only difference I seen in him, he's always been laughing up until then but he wasn't laughing then.
"Q. Was he crying? A. Well, the only  looked like tears or something. You couldn't tell."
On rebuttal the State produced Dr. Ernest Bourkard of Tampa, one of the two physicians who had been appointed by the order of the court under the provisions of Sec. 917.01, supra, and on whose testimony at the hearing conducted pursuant to that section of the statutes the court determined that the defendant was not insane then and was able to aid in his own defense. The other physician appointed in the order did not testify before the jury. Whether he did so at the previous hearing is not shown. Before reviewing Dr. Bourkard's testimony it should be borne in mind that at the time he testified on rebuttal for the State, a presumption existed that the defendant was insane. This is so because at that point in the trial of the case, it had been established that prior to the commission of the crime the defendant had been adjudged insane and had never been discharged as cured by judicial order or decree.
It has long been the law of this State and in all jurisdictions we have examined as well as at common law that a person adjudged to be insane is presumed to continue insane until it is shown that his sanity has returned. Under the common law, such an adjudication was held in all cases to be prima facie evidence of insanity and sometimes conclusive of such insanity of the person charged. At common law the proceedings by which inquiry was made *798 into the sanity of a person who was deemed to be in the nature of one in rem to determine the status of the party and that such determination was binding upon the whole world. Dewey v. Allgire, 37 Neb. 6, 55 N.W. 276, 40 Am.St.Rep. 468. As pointed out in Corbin v. State, 1937, 129 Fla. 421, 176 So. 435, 436, "In numerous cases it has been held that a person adjudged to be insane is presumed to continue such until it is shown that sanity has returned [citation of authorities]. The presumption raised by the adjudication is not conclusive, but may be overcome by proof that the accused was of sufficiently sound mind and conscience at the time of the commission of the crime to realize the character and consequences of his act."
A statement of the general law upon the subject is found in 28 Am.Jur. 751, para. 121, where it is said: "Where, however, a person has been adjudged insane or where by other proof insanity of a permanent type or of a continuing nature is shown to have existed at a time not too remote, his insanity is presumed in the absence of evidence to the contrary to have continued."
And so it is that at the time Dr. Bourkard was presented by the State as a witness on rebuttal, the burden was clearly upon the State to establish the sanity of the defendant at the time he committed the crime. We now examine Dr. Bourkard's testimony in the light of that premise because it is the only evidence in this record upon which the State relies and upon which the jury could find that the defendant was sane at the time of the commission of the offense.
Dr. Bourkard, after being qualified, was shown the order entered by the trial court under the authority of Sec. 917.01, supra, and in answer to a question as to what it was the doctor said: (All emphasis in the following is supplied by the Court.)
"A. It's an order to examine Mr. Wells as to his competency." Dr. Bourkard had testified at a hearing before the court at a prior time for the purpose of determining the competency of the defendant to go to trial. The testimony of Dr. Bourkard shows that he saw Mr. Wells only on one occasion and that was on some three weeks after the murder and at that time he examined him for a little more than an hour. In response to an inquiry as to what his examination consisted of, he said:
"A. Well, I talked to Mr. Wells, asked him a good many questions, examined him from a neurological standpoint. That is, to see if his brain and his reflexes, his peripheral nerves were functioning properly. I also examined him briefly physically because of some abdominal pain he complained of.
"Q. How long would you say you saw him that day? A. I saw Mr. Wells for approximately an hour by myself and then I called Dr. Rubio in. Dr. Rubio and I talked to him together for a short time. Then I left, allowing Dr. Rubio to talk to him alone.
"In addition to that we had an electroencephalograph performed which is a brain wave test designed to show up any organic  any physical difficulty in the brain such as a tumor or epilepsy or blood clots, degenerations and so forth."
He further testified as follows:
"Q. Well, now, in your own words will you state to this Jury the results of your examination, your conclusions, your opinion with reference to it? A. In my opinion Mr. Wells is not psychotic. That is, he is not insane. I found no evidence that he ever had been insane at any time. I asked him if he felt he was insane and he said no. His only complaint as to his mental abilities were that he occasionally suffered from loss of memory. And I could see no evidence of any loss of memory. He gave detailed reports of things that had happened a week or two previously as well as things that happened 15 or 20 years previously. I did not find his judgment was bad. I considered him to be of a little less than average intelligence but I would *799 by no means say he was feeble-minded. I saw no evidence of any hallucinations. He didn't hear voices. He didn't see things. In other words, there was no evidence of any delusions. He did not feel that people were against him, that people were persecuting him. He did not attempt to claim amnesia or loss of memory for the events of the incident of which he is charged. He gave a history of having had spells which by description were possibly epileptic. He said that those had come on him in his earlier life when he had been struck against the side of the head with a gun barrel by his brother. And he stated that after he had been to the State Hospital at Chattahoochee  and something had been done to him up there in the way of an operation  he had had no further spells of this type.
"Neurological examination was negative. All of his reflexes were good. There was no evidence of any pressure on the brain. His co-ordination was good. I felt that he knew what he was doing and knew what he was saying. He described in great detail the events of this incident of which he is charged and he told me of numerous other events that had occurred in his life. He did not try to play down the fact that he had been in many fights in his life and had been jailed on many occasions for those fights. He told me in detail of having beaten his wife on two occasions.
"Mr. Smiley: Pardon me, sir. If the Court please . I'll ask you not to relate the specific things.
"The Witness: I was simply trying to establish his memory.
"A. (Continuing.) In my opinion Mr. Wells is not psychotic, he is not insane. I feel that he is in control of his faculties, that he is able to distinguish right from wrong, if he so wishes, and that he can cooperate in his defense if he so wishes. I feel that he is responsible for his actions.
"Q. Does he, in your opinion, suffer from any type of either permanent or intermittent insanity? A. In my opinion he does not.
"Q. From what he's related to you, would he on the night of March 3rd of this year in your opinion know right from wrong in this act, what he was about to do, what he was doing was right or wrong? A. That is a very difficult question to answer because it depends on so many things. In the absence of drugs or drink and from what I saw of him on March 23 I would have said that he probably knew what he was doing."
On cross-examination the following series of questions and answers are of great pertinence to the disposition of this case:
"A. Schizophrenia.
"Q. What is that? A. Schizophrenia  the correct definition is a disassociation of effect. But in plain language it simply means that an individual becomes insane because his everyday life becomes too difficult for him and he starts living in unreality or fantasy, day-dreaming. And he may develop ideas of various types which are false. He may develop hallucinations. In other words, he may imagine that he sees things or actually sees things that are not there and hears sounds that are not present to other people.
"Q. Does that continually grow worse or  as he goes on in those circumstances and environment? A. That depends on the individual. Many cases of schizophrenia will wind up in the State Hospitals where they will spend the rest of their lives. In many cases, schizophrenia cases go to the State Hospital and go home only to go back again. Others come from the State Hospital and are well the rest of their lives.
"Q. What are the percentage of those that get well of it and are well the rest of their lives in reference to those who have to come and go to the hospital or stay in the hospital? A. I'm sorry, I don't know those figures.
*800 "Q. Will you say that it's high or low percentage? A. It used to be a very high percentage but in recent years, since the advent of various physical therapies such as insulin, electro-shock and so forth, it has greatly decreased.
"Q. If a person was afflicted with that disease of the mind and unless he received a treatment, modern treatment, then the chances are he wouldn't get well, isn't it? A. Not at all, sir. That's a disease which is characterized by remissions. In other words, it will spontaneously improve at times and also, spontaneously go back to the disease. For what reason, no one seems to know. It is felt that if treatment is secured early in schizophrenia the chances of getting well are much better.
"Q. In other words, what I mean when I ask, if a person afflicted with that particular disease, and didn't have treatment and was thrown in the same surroundings that he lived in when he  let's say, contacted or became afflicted with it  the chances are that he wouldn't improve as time went on unless he had medical treatment or went to some psychiatrist to help him? A. No, sir; I wouldn't say that. I would say that he had some pretty chances of getting well just by himself. Nobody knows why they do but a lot of people get well without any treatment at all. Again, I can't tell you the percentages. If the condition is recognized in the first six months and treatment is instituted approximately 80 percent get well. I don't think anyone has any figures on how many get well with living in the home without any treatment because there are no treatment statistics on that.
"Q. Persons afflicted with that, are they moody? A. Not necessarily. They can be quite hilarious, completely detached and retarded to the extent that you can't penetrate at all.
"Q. In fact, it might affect them to where they are laughing all the time? A. There is a type that does that, yes.
"Q. And laughing all the time about little insignificant things? A party that is afflicted with it, some of those do do that? A. That is in a particular type called (sic) habrophrenia and is characterized by the individual being silly at all times.
"Q. Now, what about the judgment of one of those persons that are afflicted with that, is it good or bad? A. The judgment is usually pretty bad.
"Q. Now, would you say that one afflicted with that particular disease, that their thoughts would show disorder? A. During the period of the disease it certainly would.
"Q. Now, what about the attitude and behaviour of one that's been afflicted with that? Would you say they were impulsive or queer and that their behaviour could not be explained? A. Not necessarily. It takes all forms. Many people can have this condition and still go on in their daily lives without requiring hospitalization.
"Q. I understand that, but do they lose more or less their contact with reality? A. In some degree usually, yes, sir.

* * * * * *
"Q. In this particular type we're talking about, the type that when they are afflicted they laugh about most everything, that is the type ? A. They usually neglect their hygiene, yes, sir.
"Q. That particular type, do they recover or do they recover unless they are given medical treatment? A. That particular type, (sic) habrophrenia, is one that has the poorest prognosis. They do not get well usually. They simply deteriorate more and more.
"Q. That's one of the worst types of this particular disease and they are the ones that rarely get well? A. Yes, sir.
"Q. In other words, they get worse and worse instead of getting well? A. Usually, yes."
The testimony of Dr. Bourkard, weighed in the light of the evidence given *801 by the witness Hagan to whom we have referred and the testimony of the numerous witnesses concerning the defendant's idiosyncrasy of laughing, supported by the unrevoked judicial adjudication of insanity in 1937, cannot be accepted as sufficient under the law to overcome the presumption that the defendant was insane at the time he committed the offense.
In this discussion of opinion evidence we are cognizant of the fact that there are limitations upon the conclusiveness of that kind of evidence. Nevertheless, the life of a human being is involved in what this witness says. The inconclusiveness and extremely speculative and unconvincing nature of the evidence of Dr. Bourkard may well be attributed to the fact that when he originally examined the defendant, he was making such examination for the purpose of determining the sanity of this man at the time of the examination for the purpose of ascertaining whether he was sufficiently sane to be tried and to aid in his defense. While it does not appear from the record, it is obvious to this Court that Dr. Bourkard did not have the advantage of the history of the defendant as related by the witness Hagan and the others who told of the idiosyncrasies of the defendant referred to above. When we weigh Dr. Bourkard's testimony in the light of what these witnesses said of the conduct of this defendant over a period of many years  witnesses who had observed him for as long as three decades  the weight of Dr. Bourkard's conclusion that the defendant was sane is greatly weakened, and patently inconclusive. Throughout the books that have been written on the subject of insanity and in the many cases on the subject, the opportunity for observation of the witness testifying seems to be an essential and well nigh indispensable element in weighing the testimony he gives. For instance, it is said in 28 Am.Jur. 763, para. 135 "Thus the number, character and intelligence of the witnesses and their opportunities for observance should be considered upon the question of insanity." Dr. Bourkard testified that schizophrenia is characterized by remissions. He said: "In other words it will spontaneously improve at times and also spontaneously go back to the disease." Moreover, when Dr. Bourkard was speaking in the present tense there was some degree of conclusiveness to his opinion. For instance, he said "I feel that he is in control of his faculties, that he is able to distinguish right from wrong, if he so wishes, and that he can cooperate in his defense if he so wishes. I feel that he is responsible for his actions." In this testimony he is obviously speaking of the defendant as of that time. But when he was asked as to his opinion of the defendant's mental condition when the crime was committed, (the crucial and determinative factor) his testimony becomes wholly inconclusive. He stated: "That is a very difficult question to answer because it depends on so many things. In the absence of drugs or drink and from what I saw of him on March 23 [the one hour examination] I would have said that he probably knew what he was doing."
There is absolute finality in an executed sentence of death. The taking of a human life is a matter that cannot be justified upon evidence as inconclusive, speculative and unconvincing as that of the sole psychiatrist in this cause; and it is on this testimony the State had to rely to overcome the presumption of insanity that the law placed around this defendant.
It has been argued by the State, albeit not with great vigor, that the question which we have discussed and decided here were not properly preserved for this Court's consideration. We must concede that they were not presented as clearly and concisely as they should have been presented but in appeals where the death penalty has been imposed, we feel it our duty to overlook technical niceties in the interests of justice. This liberality is not only warranted under our inherent power but is expressly contemplated by Sec. 924.32(2) F.S. 1955, F.S.A., which provides that: "Upon an appeal from the judgment by a defendant *802 who has been sentenced to death the appellate court shall review the evidence to determine if the interests of justice require a new trial, whether the insufficiency of the evidence is a ground of appeal or not." The statute is particularly apropos to this case.
Moreover, we think the charges of the trial court on the question of insanity tended to confuse the jury in the determination of the guilt or innocence of this defendant and were, therefore, erroneous.
The court should have charged the jury in an affirmative manner on the question of the presumption of insanity of the defendant. He should have told the jury that in view of the fact that it was undisputed in the record that the defendant had been adjudged insane and not restored to sanity, the presumption of insanity created thereby had to be overcome by the State by competent evidence. In part the court did this, but the fault we find with the charge is that it left to the jury the question of determining whether the presumption existed. For instance, the court charged the jury as follows:
"The Court further charges you Gentlemen of the Jury, as to the said Defendant, Willie Andrew Wells, that if prior to the commission of the alleged offense if such an offense was committed, you believe from the evidence in the case that the said, Willie Andrew Wells, was adjudged insane by the Court of the County Judge in and for Charlotte County, Florida, and you should further believe that he has never been judicially restored to sanity, the presumption would be that he continues insane, and that he was insane at the time he committed the alleged offense, if you believe he committed it, and unless that presumption is overcome by evidence in the case, you would be justified in believing and finding that the said Willie Andrew Wells was insane at the time the alleged offense was committed, if you believe from the evidence such offense was committed."
In the next sentence of the charge the court said:
"Every man is presumed to be sane until the contrary is proved, and when insanity is set up by the defense, the burden of proof lies upon him to prove it."
The question of whether the defendant had been judicially restored to sanity was no longer a jury question because the record was wholly devoid of any evidence controverting that fact. We think the above charges, even when read in the light of all of the charges of the court, as we have carefully and meticulously done, tended to confuse the jury and to leave them with the impression that it was within their power to determine whether the defendant had been judicially restored to sanity, a power they did not possess.
Reversed and remanded for new trial.
TERRELL, C.J., and HOBSON and O'CONNELL, JJ., concur.
THORNAL, J., concurs in judgment of reversal.
THOMAS and ROBERTS, JJ., dissenting.
THORNAL, Justice (concurring in judgment).
I concur in the judgment of reversal because it appears to me that the State failed entirely to carry the burden of proving the sanity of the accused at the time of the commission of the crime. I do not agree that error was committed in giving the instruction quoted in the main opinion. The defendant requested it; hence it is not available to him as error.