165 So.2d 436 (1964)
Charles HIXON, Appellant,
v.
STATE of Florida, Appellee.
No. 4151.
District Court of Appeal of Florida. Second District.
June 17, 1964.
*437 P.B. Howell, Jr., Leesburg, and T.R. Champion, Mount Dora, for appellant.
James W. Kynes, Atty. Gen., Tallahassee, Robert G. Stokes, Asst. Atty. Gen., Lakeland, for appellee.
*438 KANNER, Judge (Ret.).
Charles Hixon, an escapee from the Athens State Hospital in Ohio, was convicted by the jury for first degree murder of his divorced wife, Lucille Lively and, consequent upon the jury's recommendation of mercy, was sentenced by the court to be confined to the custody of the Department of Correction for the rest of his life.
The narrative which unfolds through the record reveals that a sequence of pertinent events antedating the homicide began on May 12, 1958, in Ironton, Ohio, when Hixon, a television and radio repairman by trade, was adjudged mentally ill by the probate judge of Lawrence County, Ohio, who heard testimony of his wife, Lucille, and of two medical witnesses. He was committed to the Athens State Hospital on May 15, 1958, where, according to the hospital records, a diagnosis of schizophrenic reaction, paranoid type, was made. On June 29, 1958, Hixon was permitted with some reservations to go to his mother's home for a trial visit of four weeks; there was the notation, "He does not have any privileges at the present time." On July 5, the hospital received a letter from Hixon's mother saying that he would not cooperate in taking his medicine, that he talked about his wife all the time, that he was doing the same thing as before, and that his wife had had him locked up. He was returned to the hospital and placed in another ward for further care. On July 17, he escaped from the ward while out on recreation and was never returned to that hospital.
Lucille Lively, meanwhile, had divorced Hixon and had moved to Leesburg, Florida. Hixon, after his escape, left for Florida sometime in early November, 1958. While waiting for a bus in Orlando, he noticed a newspaper advertisement of a pistol for sale and purchased it, along with cartridges, then caught a bus for Leesburg. On the afternoon of November 10, 1958, he observed Lucille Lively with her stepmother on a downtown street in Leesburg, approached her, exchanged greetings with the two, and a short conversation ensued:
"What did you send for me for, Lu?"
"I never sent for you."
"You sent two cards sending for me to come to Leesburg."
"I never sent for you. I am going to get married Christmas."
"Who to, Red?"
"I don't know anyone by the name of Red."
Thereupon, Hixon took his pistol from his pocket, shot Lucille until she fell, face down, then stooped and, holding the pistol to her head, shot again. He departed the scene at a rapid rate, waving the pistol in the air. Pursued by an off-duty police officer, Hixon took refuge under a house and was later forced out by officers using tear gas.
Hixon was placed in the county jail in a cell separate from the other prisoners. Upon motion for insanity hearing and determination filed by court-appointed counsel, he was transported to the Florida State Hospital at Chattahoochee on April 1, 1959, with Doctors Cronick and Eaton of the medical staff being ordered to examine the prisoner and make a report. By order of July 1, 1959, the court adjudged him "in fact insane and incompetent to conduct his defense" upon the basis of the report of Doctors Cronick and Eaton which had been made under date of May 12, 1959; and Hixon was committed to the Florida State Hospital for care and treatment. On September 28, 1962, the hospital filed a competency discharge. As the result of a hearing at which Doctors Vaughn and Newman, court-appointed psychiatrists, testified, Hixon on February 5, 1963, was by the court found "sane enough" to stand trial.
There is no contention that the homicidal deed here involved was not perpetrated by Hixon, but his defense is that he is not *439 guilty by reason of insanity. The position which he asserts on the appeal is that he, as defendant, established his insanity prior to the homicide and continuing to and during the time of that deed; that the state thus became burdened with a presumption of his continuing insanity which it was required to overthrow by competent evidence establishing his sanity at the time of the act in question; and that the state failed to meet this obligation. The state, opposing, contends that the evidence effectively proved that Hixon knew right from wrong at the time of the shooting. We agree with the position assumed by the defendant.
One cannot be held legally responsible for an act committed by him while insane, although the act would be criminal if done by a sane person. Sanity is the normal condition of man; and, when charged with a crime, he is presumed to be sane. The mere fact that a person has committed a crime is not sufficient to overcome this presumption, but he has the burden of establishing his plea of insanity by showing that he was legally insane at the time he committed the act in question. The exclusive rule recognized in Florida is the "right and wrong" test, also referred to as the M'Naghten rule, for determination of the sanity of an accused. This rule prescribes essentially that if an accused was possessed of sufficient understanding at the time he committed the act to know what he was doing and knew that it was wrong, he is responsible for the act; if, on the other hand, he did not know the nature and quality of the act he was committing or did know what he was doing but did not know that it was wrong, he is not responsible for his act. Camp v. State, Fla.App. 1963, 149 So.2d 367. The Florida jurisdiction since early times has recognized the tenet that "Where insanity of a permanent type, or of a continuing nature, or possessed of the characteristics of an habitual or confirmed disorder of the mind, as distinguished from temporary or spasmodic mania, or disorders of mind produced by the violence of disease, is shown to have existed a short time prior to the commission of an act, it is presumed to continue up to the time of the commission of the act, unless this presumption is overcome by competent testimony." Armstrong v. State, 1892, 30 Fla. 170, Syllabus by the Court, paragraph 4 of 11 So. 618, 626, 627, 17 L.R.A. 484, Thomson v. State, 1919, 78 Fla. 400, 83 So. 291.
Also, one who has been adjudged insane is presumed to continue so until it is shown that sanity has returned. The presumption arising from the adjudication is not conclusive, however, but may be overcome by proof that the accused was of sufficiently sound mind and conscience at the time he committed the crime to realize the character and consequences of his act. Wells v. State, Fla. 1957, 98 So.2d 795; Corbin v. State, 1937, 129 Fla. 421, 176 So. 435.
The defense relied upon hospital records, expert medical testimony, and records of the official proceedings. The state offered no medical testimony but presented only lay witnesses. In order to bring the evidentiary picture into chronological perspective, we begin by reviewing the Athens State Hospital records and then the expert testimony, some of which relates to Hixon's mental condition while he was in that institution.
The diagnosis at the Ohio hospital, as we have pointed out, was that of schizophrenic reaction, paranoid type. Hospital records made on Hixon's admission indicate that, by the medical certificate, Lawrence County Probate Court commitment, the onset of the attack had been gradual; the patient was described as "Dangerous, destructive, depressed". It was indicated that he had threatened to kill his wife, that he felt her to be in the wrong, that domestic difficulties was the supposed cause of his attack. The record shows a history of syphilis suffered by Hixon at a prior time. On May 29, 1958, Dr. Fockler of the Athens State Hospital examined Hixon and recorded, "It has been the examiner's impression *440 that this man is a much more seriously ill man than the interview would indicate. I spoke to his mother and sister yesterday and they along with the Rorschach impress me that he is definitely psychotic." Just before he escaped on July 17, 1958, after the trial visit to his mother, Hixon had been transferred to another ward for further care and was taking 50 mg. of sparine twice daily. On July 28, 1958, it was set out in the hospital records that Hixon's divorced wife had written in to state that he had made "awful threats" over the telephone recently.
The medical experts who testified included Dr. Dutton, who was on the staff of the Athens State Hospital while Hixon was a patient there and was one of his attending doctors; Doctor Eaton, who with Dr. Cronick, both of the Florida State Hospital, conducted the mental examination which resulted in Hixon's commitment to that institution; and Doctors Vaughn and Newman of Gainsville, Florida, whose examination of the accused determining him to be a schizophrenic paranoid in remission was the basis for the court's finding that Hixon was sane enough to stand trial. They were unanimous in their opinion that Hixon's mental illness was schizophrenic reaction, paranoid type, the most serious or a major type of mental illness, in Hixon's case long and continuing or chronic and progressive. By Dr. Dutton's testimony, Hixon's symptoms had predated his admission to the Ohio hospital and there had been essentially no change during his stay there. Dr. Dutton specifically stated that in his opinion Hixon was insane while he was in the Athens State Hospital and at the time he escaped and was then unable to distinguish right from wrong. Each doctor gave as his opinion that Hixon's illness was definitely connected with the shooting or with his feelings of infidelity on the part of Lucille Lively. All characterized symptoms of his type of mental illness as often being difficult or at times impossible of discernment by an ordinary lay person, because, as Dr. Dutton put it, there could be something underlying which was not being demonstrated. The Florida doctors all stated that in their opinion Hixon, at the time he shot and killed his former wife, did not know right from wrong. Each of these witnesses, upon cross-examination, acknowledged the possibility that Hixon could have been in remission at the time of the shooting and admitted it was therefore possible that he could then have been able to distinguish between right and wrong. However, none receded from his positively expressed opinion that Hixon at the time of the act in question did not know right from wrong.
The evidence adverting to Hixon's mental condition up to the time of the homicide stands unrefuted, the six rebuttal witnesses relied upon by the state having testified only with respect to that which transpired subsequent to the deed. Hixon's evidence, therefore, establishes a presumption of his insanity to that time.
Not one of the six lay witnesses above referred to saw or knew anything about the accused except at some point during brief interims while he was either in flight or in custody. Four of them testified that in the past they had had occasion to observe persons who were transported to state hospitals and who were sane or insane. The sheriff, from observation of Hixon on the day of his apprehension and a few times at the jail, found him intelligent and "in most instances" cooperative; on cross-examination he acknowledged that Hixon had been kept in a section of the jail separate from the other prisoners, among whom he had caused trouble through offering legal advice. A newspaper reporter expressed her opinion upon the basis of a conversation which she overheard on the afternoon of November 10 following the shooting; she talked with Hixon also. A deputy sheriff sat in the car with the accused ten or fifteen minutes and talked with him. The prosecuting attorney in the county judge's court saw Hixon as he emerged from under the house and overheard him conversing while in the sheriff's car on the afternoon *441 of and subsequent to the shooting. He was there three to five minutes. The chief of police saw Hixon on the afternoon of the homicide, overheard conversation with newspaper reporters and others. The police officer who chased the accused to his hiding place asked him one question, received an answer, and also observed him when, in flight, the fugitive "turned" on him. Each witness, in the course of his testimony, concluded with an expression of his opinion as to Hixon's mental condition by giving an affirmative reply to such questions as whether in his opinion Hixon at the time was "mentally normal" or "mentally sane."
In a criminal prosecution, a lay or nonexpert witness may be permitted to give an opinion regarding the sanity or insanity of the person whose mental condition is in issue, but he cannot express general opinions as to sanity nor give opinions independent of facts and circumstances within his own knowledge. The opinion, rather, is to be given after the witness has testified with regard to appearances, actions, and conduct of the person whose sanity is being investigated; and such a witness must testify from personal knowledge and observation. Thus, a nonexpert witness who bases his testimony upon relevant facts and circumstances known to and detailed by him may give an opinion as to sanity. 20 Am.Jur., Evidence, sections 852, 853, 854, pages 713-716; 2 Underhill's Criminal Evidence, pages 1147, 1151; 2 Wharton's Criminal Evidence, section 532, pages 371-372; Armstrong v. State, supra; Hall v. State, 1919, 78 Fla. 420, 83 So. 513. The opportunity for observation by the witness testifying appears to be an essential element in weighing the testimony given by him. Wells v. State, 1957, 98 So.2d 795.
We must remember that this is a case where, because of the presumption of continuing insanity, the prosecution was freighted with the burden of overcoming that presumption by establishing that Hixon at the time of the killing knew right from wrong. The opportunities of the state's nonexpert witnesses for observation were brief and, in the main, limited to a single occasion subsequent to the shooting. As to specifics or details of relevant facts and circumstances with respect to particular acts, conversations, appearances, or conduct of Hixon, their testimony presents but meager evidentiary matter as against the total evidence of the defense and as against the presumption which was created by it.
From the opinions of the medical witnesses, the hospital records, and the documentary evidence of official proceedings, the following significant observations may be made. Symptoms of the accused's type of mental illness are often difficult to detect by a lay person. Hixon was adjudged mentally ill and also was diagnosed insane before the homicide and was diagnosed and adjudged insane after that act. All the expert witnesses, examining psychiatrists of Hixon, linked his illness to Lucille Lively or the shooting. It was four months following his escape from the Ohio hospital to the time of the shooting and five months from the date of that event to the time he was taken to the Florida State Hospital; yet it was necessary that he be detained at the Chattahoochee hospital for about four years after the homicide. Although he was repeatedly examined by psychiatric specialists, both in Ohio and in Florida, Hixon, after passage of four years, was found "sane enough" to stand trial upon the basis of a hearing, at which examining psychiatrists testified, showing that he only was in a state of remission. Finally, in addition to the presumption of continuing insanity of the accused to the time of the shooting, there was the unanimous opinion of the Florida doctors that, at the time of the act in question, Hixon did not know right from wrong.
While, in a case of this kind, it is with great reluctance that a court will disturb a verdict of the jury, a verdict which is clearly against the evidence should be set aside. Feeling as we do that the verdict *442 runs clearly counter to the evidence, it follows that we must reverse the judgment of conviction and direct that the case be tried anew.
Reversed and remanded for new trial.
SMITH, C.J., and HEWITT, ROBERT S., Associate Judge, concur.