RYDER, Judge.
Howard Beck appeals a trial court order establishing a constructive trust on half of the funds of a totten trust of which he is the beneficiary. The constructive trust divides the totten trust funds between his sister, Ruth Gross, and him. We reverse.
Anna Beck had two stepchildren, Howard Beck Sr. and Ruth Gross. Anna Beck executed a will in 1972 leaving everything to Howard Beck, Sr. On June 12, 1984, a totten trust account was opened bearing the title “Anna Beck as trustee for Howard Beck, Sr.” Richard Walden, Ruth Gross’ son-in-law, accompanied Anna to the bank and helped her open the new totten trust account. The balance of this account, approximately $58,300.00, came from three previous accounts owned by Anna Beck. One previous account, containing approximately one-third of the new account’s total, was a previously established totten trust account for Howard Beck.
Dr. Latus, an osteopath, made a house call to Anna Beck in late May or early June 1984, and treated her for a growth on the back of her leg. Anna Beck made several office visits to Dr. Latus through December 11, 1984 when she was hospitalized for congestive heart failure. Dr. Latus saw her in the hospital, and visited her for the last time on December 19, 1984. Shortly after that time, Howard Beck removed Anna Beck to Reno, Nevada, where he lived. On December 20, 1984, Ruth Gross filed a complaint against Howard Beck and the savings and loan where the totten trust account had been established. She sought a preliminary injunction to bar any distribution of the funds of the account, and a declaratory judgment of the rights of the parties. The court granted the preliminary injunction. On January 27, 1985, Anna Beck sent a letter to the trial judge asking him to release the funds in the account so that they could be transferred to an account in a bank in Reno. Anna Beck died on January 30, 1985. Shortly after Anna’s death, Ruth Gross amended her complaint requesting the court impose a constructive trust upon one-half of the funds in the totten trust.
At trial, Ruth Gross’ counsel called three witnesses. Richard Walden testified that he is Ruth Gross’ son-in-law, and was her agent for the matters concerned in this controversy. He also testified he helped Anna Beck open the totten trust account in trust for Howard Beck, but also testified *888 that Anna Beck desired that the funds be divided equally between Howard Beck and Ruth Gross. Jane Walden testified that she is Richard Walden’s wife and Ruth Gross’ daughter. Part of her testimony corroborated Richard’s testimony, and the other part dealt with other financial matters of Anna Beck. Ruth Gross testified that Richard Walden was her agent in the totten trust matter. The deposition of Anna Beck’s treating physician, Dr. Latus, was admitted into evidence.
Defendant Howard Beck’s case consisted of a cross-exam of Ruth Gross, who testified she last saw her stepmother, Anna Beck, in 1982. Blanche Malloy, a neighbor of Anna’s when she lived in Pinellas Park, testified that she had frequent contact with Anna and that Anna wanted her estate to go entirely to her son Howard. Huda Altman testified she helped care for Anna between the time she was released from the hospital in December of 1984 to the time she died at the end of January 1985. She gave specific facts leading to her opinion that Anna Beck was competent up to the day she died. Howard Beck testified as to Anna’s competency, and denied giving his son the authority to act on his behalf in the totten trust matter. He also denied the existence of an oral agreement that Ruth Gross would receive half of the funds of the totten trust.
The trial court found that Anna Beck intended for both stepchildren to share equally in the funds in the totten trust, and that after Anna opened the trust she was incompetent, therefore unable to revoke. The trial court ordered the imposition of a constructive trust, awarding half the funds in the totten trust to Ruth Gross.
Howard Beck appealed. The lengthy briefs of the parties (together equaling more pages than the trial transcript itself) can be boiled down to two central issues. Was Anna Beck competent during the last eight months of her life? Did Anna Beck intend for her stepchildren to share equally in the funds of the totten trust?
The trial court found: “Although Anna later expressed a desire that the funds all be paid to Howard Beck, Sr., that occurred during a period shortly before her death when she was incompetent, according to her physician who treated her from June 14 until December of 1984....” The trial court clearly relied on Dr. Latus’ deposition in finding that Anna Beck was incompetent. The only other evidence that Anna was incompetent during this time is a letter from Howard Beck’s son to Richard Walden, admitted as plaintiff’s exhibit # 2. Two witnesses testified at trial that Anna was competent during this time: Howard Beck and Huda Altman. Richard Walden’s testimony implied that he believed Anna Beck was competent on the day he and she set up the totten trust. In fact, no one at trial questioned Anna’s competency when she opened the totten trust account on June 12, 1984.
Dr. Latus’ deposition indicated he believed Anna was incompetent from late May or early June until December 19,1984. The letter from Howard Beck’s son to Richard Walden, dated July 24, 1984, stated: “I think all of us agree that Anna is not legally competent at this time_” Neither document should have been considered by the trial court in deciding the competency of Anna Beck. Both are opinion testimony of lay witnesses, and should have been excluded from the trial court’s consideration by section 90.701, Florida Statutes (1985). Beck’s son did not testify at trial, and his letter contained not only his opinion but also the opinion of others. It should have been excluded as hearsay. Additionally, there is no evidence that Beck’s son had personal knowledge of Anna’s competency. Hixon v. State, 165 So.2d 436, 441 (Fla. 2d DCA 1964).
Dr. Latus’ deposition presents a harder question. The trial court clearly relied on the deposition in determining Anna Beck was incompetent. What is not clear is whether the trial court admitted the deposition as that of an expert or a lay witness. We assume that the trial court admitted the deposition as that of a lay witness, based on the fact Dr. Latus was *889 not qualified as an expert prior to testifying, and based on the following discussion:
MR. DANN: We are ready to rest. We offer the deposition of Dr. Tom Latus. THE COURT: Any objection?
MS. BILLINGS: I object, number one, on his competency because I have to know what they’re offering the deposition into evidence for. If they’re trying to say he’s an expert witness—
THE COURT: Who’s it a deposition of? MS. BILLINGS: He’s an osteopath.
THE COURT: A lay witness. He can offer it as to the sanity of a fellow human being. If it’s a lay witness, let him do that.
Again, the opinion of the lay witness can only be given after he has testified as to facts or perceptions underlying his opinion. The proper predicate was not laid for Dr. Latus’ lay opinion. The essence of Dr. Latus’ deposition is: counsel recited the test for competency in executing a will and then asked Dr. Latus, “Is it your opinion that Anna Beck was incompetent within the meaning of that definition?” Dr. Latus replied, “Yes.” Dr. Latus gave no testimony of Anna’s appearance, actions, or conduct. See Hixon. Both of the witnesses who testified that Anna was competent predicated their opinion on Anna’s specific actions and conduct. Since there was no admissible evidence before the trial court of Anna’s incompetence, the trial court erred in finding Anna incompetent during the period of time shortly before her death.
The second central issue is: Did Anna Beck intend for her stepchildren to share equally in the funds of the totten trust? The title of the totten trust evidenced Anna’s intent: “Anna Beck was trustee for Howard Beck, Sr.” Anna Beck’s last will and testament, admitted into evidence at trial, evidenced Anna’s intent: The will devised everything to Howard Beck, Sr. The testimony of Blanche Malloy, a neighbor, evidenced Anna’s intent: Anna wanted her son, Howard, to get what she had. All of this evidence of Anna Beck’s intent to give her worldly possessions to Howard Beck, Sr. goes against the trial court’s final judgment. It should be noted here that the trial court found in its final judgment that: “During the summer of 1984, an agreement was reached between RUTH GROSS and HOWARD BECK, SR., providing that ... [ujpon the death of Anna Beck the balance then in the account would be divided by the beneficiary between himself and RUTH GROSS.” The trial court clearly relied on that alleged agreement as evidence of Anna Beck’s intent. The trial court clearly erred. In the case at hand, Anna Beck’s intent cannot be inferred from other people’s agreements. The only evidence presented by Ruth Gross that Anna Beck intended that 50% of the account go to her is the testimony of Richard Walden and Jane Walden. Richard Walden testified that Anna Beck told him during the first visit to the bank to put the account in Howard’s name only because he “was the man, he was the oldest and that he would distribute the funds equally between he, Howard Senior, arid Ruth.” He testified she said “essentially” the same thing on the second visit to the bank. Jane Walden’s testimony concerning Anna’s intent was as follows:
Q Let me deal with specific things. You heard your husband testify you were present when Anna made a statement at a bank concerning her desire for the money that eventually founded the totten trust account to be distributed to her two stepchildren by her stepson as agent because he was the older and a male?
A That’s correct.
Q Did you hear her say that?
A Yes, I did.
Plaintiff below, Ruth Gross, testified she never talked to Anna Beck about money.
Given the fact that the trial court erroneously weighed the alleged agreement as evidence of Anna’s intent, and given the meager testimony presented by the party bearing the burden of proof, we hold there was not substantial, competent evidence upon which the trial court could have based its final judgment. We are not reweighing the evidence. Friedman v. U.S. Home *890 Corp., 452 So.2d 1111, 1113 (Fla. 2d DCA 1984); Withers v. Flagship Peoples Bank, 473 So.2d 789, 791 (Fla. 1st DCA 1985). In viewing the record as a whole, the trial court’s final judgment is contrary to the legal effect of the evidence.
There are two further points that deserve mention. Richard Walden actively assisted Anna Beck in opening the totten trust account. While assisting Anna, he was acting as the express agent of Ruth Gross. As a lawyer, no one was in a better position to explain to Anna (even if she was hard of hearing) the legal effect of opening the totten trust as she did. No one knew better than Richard the legal problems of relying on an oral promise (if there was one). Thus, it is reasonable to assume that Anna knew exactly what she was doing when she opened the account, and the account reflected her complete intent in the matter. The other pertinent point is that Ruth Gross waited five months — until Anna was near death — after the repudiation of the alleged oral promise, to seek a declaratory judgment distributing the funds equally. Ruth Gross, through the Waldens, had notice of the repudiation as early as Beck’s son’s July 1984 letter. She waited to file suit until after Anna Beck was moved to Reno, Nevada. Anna Beck herself would have been the best person to ask as to her intent in opening the totten trust account.
We hold that there was no evidence properly before the trial court that Anna Beck was incompetent. She opened a totten trust account on June 12, 1984 entitled “Anna Beck as trustee for Howard Beck, Sr.” The legal effect of the evidence presented contrary to Anna’s express intent was insufficient to support the trial court’s final judgment. Therefore, Howard Beck is entitled to 100% of the funds in the account.
One final issue remains: Did Anna successfully revoke the totten trust by her January 27, 1985 letter to the judge? We agree with the trial court that the facts and circumstances surrounding the letter give rise to Carpenter presumptions, thereby invalidating the revocation absent a reasonable explanation by Howard Beck, Sr. See In re Estate of Carpenter, 253 So.2d 697 (Fla.1971). However, the invalid revocation does not affect Howard’s entitlement to the proceeds. It simply means Howard will receive the funds directly from the totten trust account rather than through Anna’s will as the beneficiary in her residuary clause if the revocation had been valid.
We reverse the final judgment of the trial court and remand for an entry by the trial court of a final judgment consistent with this opinion.
Reversed and remanded.
GRIMES, A.C.J., and SCHOONOVER, J., concur.