809 So.2d 107 (2002)
Kathleen BUSH, Appellant,
v.
STATE of Florida, Appellee.
No. 4D00-384.
District Court of Appeal of Florida, Fourth District.
March 6, 2002.
*109 Carey Haughwout, Public Defender, and Joseph R. Chloupek, Assistant Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Melynda L. Melear, Assistant Attorney General, West Palm Beach, for appellee.
FARMER, J.
After a four month jury trial, Kathleen Bush was found guilty of aggravated child abuse of her daughter, Jennifer, and organized fraud against Medicaid. She raises six arguments on appeal alleging fourteen reversible errors. We affirm her conviction.
Bush began reporting that Jennifer suffered from chronic diarrhea to Jennifer's pediatrician, Dr. James Deleo, in October 1987, when Jennifer was five months old. Upon examination, Dr. Deleo discovered that Jennifer had a low white blood cell count, common in infants with a slow developing immune system, and placed Jennifer on a regimen of intravenous gamma globulin injections. Eventually, a surgeon installed in Jennifer's chest a device called a "port-a-cath" because Jennifer's peripheral veins were no longer able to tolerate intravenous infusion.
In October 1988, Bush began employment as Dr. Deleo's office manager. As Bush's reports of chronic diarrhea continued, *110 and now with the addition of chronic vomiting, Dr. Deleo referred Jennifer to two pediatric gastroenterologists for examination. Both found Jennifer's bowels and weight to be normal and no evidence of gastrointestinal problems. Still, for the following four months, Bush continued reporting that Jennifer suffered from chronic diarrhea and vomiting.
In June 1989, Bush reported that Jennifer was experiencing seizures since she slipped, fell, and hit her head on bathroom tile. Dr. Deleo referred Jennifer to Dr. Carlos Gadia, a pediatric neurologist, who examined Jennifer, conducted a CAT scan and EEG of Jennifer's brain, and found her neurologically normal. A month later, Bush again reported seizure-like symptoms. With Dr. Gadia's consent Dr. Deleo prescribed Tegretol as a precautionary measure for Jennifer.
Tegretol is an anti-seizure drug, orange in color and is orally administered. Children who take Tegretol have a much higher chance of aplastic anemia and depression of the body's ability to produce white blood cells. Symptoms of Tegretol at a toxic level are ataxia, increased heart rate, dilated pupils, myoclonus (limb twitching), and gastrointestinal symptoms, such as nausea, vomiting, and diarrhea. If the toxicity level becomes high enough, severe seizures and cardiac arrhythmia can result, often leading to death.
Throughout 1989 and early 1990, Bush continued to report to doctors that Jennifer suffered from chronic diarrhea and vomiting, ataxic behavior, and now abdominal pain. No medical explanation was found. In May 1990, Dr. Deleo referred Jennifer to a third pediatric gastroenterologist, Dr. Alejandro Flores, located in Boston. Dr. Flores conducted various examinations of Jennifer, reviewed Jennifer's medical history, obtained a medical report from Bush, and concluded that Jennifer suffered from a neuropathic gastrointestinal motility disorder. This is a problem arising from the failure of the brain to instruct the nerves of the intestines to exercise the muscles properly. Dr. Flores recommended a prescription of Cisapride, and if that did not stop Jennifer's vomiting, installation of feeding tubes. Tegretol especially in toxic amountscan cause slowed motility.
Although Cisapride treatment followed, Bush's reports of chronic vomiting, diarrhea, and intolerance to food continued. Consequently, a surgeon installed feeding tubes in Jennifer. First, a tube was inserted into her stomach through the intestinal wall, known as a gastrostomy tube or "G-tube." Second, a tube was inserted into Jennifer's small intestine, known as a jejunum feeding tube or "J-tube." Through the tubes, Jennifer was fed Vivanex, a liquid formula containing daily nutrients. Otherwise, Jennifer would receive TPN, Total Parenteral Nutrition, a nutritional formula administered directly into the bloodstream intravenously.
Also in 1990, Jennifer was diagnosed with sepsis, believed to be caused by bacteria entering her port-a-cath. In fact, throughout the entire time Jennifer lived with Bush, she suffered from fifteen episodes of sepsis. Of these fifteen episodes, three of them were diagnosed as polymicrobial, of multiple organisms. Expert opinion explained that a polymicrobial infection is rare, because normally an infection in the bloodstream is due to one microorganism traveling throughout body. This was the first time Jennifer's pediatric infectious disease specialist, Dr. Alfredo Murciano, saw a polymicrobial infection in the bloodstream. In Doctor Eli Newberger's opinion, a Harvard Medical faculty member and pediatrician, the first instance of polymicrobial sepsis is an "extraordinary event"; a second instance in the same *111 person would be "extremely unusual"; and the possibilities for a third incident would be "vanishingly small," a "quirk of biology," or an indication of intentional infection. During Jennifer's last episode of polymicrobial sepsis, Jennifer was diagnosed with a urinary tract infection due to a microorganism different from the sepsis microorganisms. Dr. Newberger opined that this is very odd, as usually the bacteria causing the tract infection would be the same as the bacteria causing the sepsis.
With many of the diagnosed episodes of sepsis, Jennifer's port-a-cath had to be surgically removed and replaced in another area of her body. Often Jennifer's feeding tubes had to be surgically removed and replaced because of frequent dislodging. Because these surgeries required lengthy stays under medical care, Jennifer was a frequent visitor at Coral Springs Medical Center and Hollywood Memorial Hospital.
Six nurses at Coral Springs Medical Center testified that Jennifer's health deterioration during Bush's visits became "routine" and "seemed to be a pattern." On numerous occasions, including "every morning without exception," when Bush visited Jennifer in Jennifer's private hospital room, Jennifer would begin vomiting or suffer from ataxia immediately after Bush departed although prior to the visit Jennifer was playful and alert. The nurse manager, if aware that Bush was going to visit Jennifer that day, would assign one nurse to care only for Jennifer and divide the other patients among the remaining nurses. If, on the other hand, both Bush and her husband were going to visit, then the manager would assign the nurse to care for Jennifer and other patients as well.
Nurses from both hospitals reported numerous suspicious incidents, including occasions when Jennifer's feeding or IV pumps would mysteriously malfunction while Bush was present, reports of vomiting unobserved by anyone but Bush, and submission by Bush of contaminated urine samples. See Appendix A. None of the hospital nurses reported Bush's activities to HRS, although it was their legal duty to report suspicions of child abuse. Instead, the nurses reported their suspicions to their nurse manager and Dr. Deleo.
On May 25, 1990, Jennifer's Tegretol prescription was put on hold because a blood test indicated that Jennifer's Tegretol level was toxic and all nurses were informed of the hold. After the discontinuation of the medication, Jennifer's blood was tested twice a day to determine its Tegretol level. Yet Jennifer's blood continued to test positive for the presence of Tegretoloften in toxic levelsfor the next nineteen days, a matter of perplexity to her doctors.
During this hold period, nurses reported that on occasion Jennifer vomited an orange substance and had orange stool, both the color of Tegretol. A sample of Jennifer's gastric fluids was tested during the hold period and the results indicated the presence of Tegretol. Bush visited daily throughout this time period, each morning and evening. One nurse observed Bush with Jennifer in Jennifer's hospital room, heard Jennifer scream "no, no, no," and saw Bush giving Jennifer something orally by syringe. Within approximately thirty minutes Jennifer vomited a substance that smelled like and was the same color (orange) as Tegretol.
On June 15, Dr. Deleo discussed with Bush his confusion as to why Jennifer still had Tegretol in her blood and sometimes at toxic levels since the medication was on hold. By June 18, the level decreased to 0%. A nurse recalled that on June 17, while Jennifer was sleeping, Bush spontaneously and tearfully stated at her bedside, *112 that she would never do anything to hurt Jennifer.
Through this time, Bush continued to report that Jennifer was experiencing seizures. Neither Dr. Gadia, Dr. Deleo, nor the nurses who cared for Jennifer ever observed Jennifer have a seizure.[1] Although she was subjected to numerous CAT scans, MRIs, and EEGs, no medical reason was ever found for Jennifer's alleged seizures by either Dr. Deleo or Dr. Gadia. Bush also added claims that Jennifer suffered from joint aches and eye problems. Consequently, Jennifer was referred to various specialists, such as a radiological orthopedic specialist, a metabolism specialist, and an optometrist, to determine the source of these problems. Similarly, no medical reason was ever found for Jennifer's alleged ailments.
Bush ceased working as Dr. Deleo's office manager in November 1993. Before that date, Dr. Deleo was not only Jennifer's pediatrician but also a close family friend and a neighbor of the Bush family. The Deleo family and Bush family would socialize, celebrate holidays together, and go on family vacations together. When Bush was discharged from Dr. Deleo's employment, the separation was hostile, the two families no longer interacted with each other, and Dr. Deleo stopped serving as Jennifer's pediatrician. Coincidently, during the eight month period following the discharge, Jennifer was free from hospitalization and sickness.
From 1995 until 1996, two home-care registered nurses cared for Jennifer. One of the nurses observed that Bush kept thirty bottles of Tegretol at home, although based on Jennifer's dosage a single bottle would last one-to-two months. Often there was more than one bottle of Tegretol opened for use, even though Jennifer was the only household member for whom the medication had been prescribed. When Jennifer's prescription for Tegretol was terminated, Bush instructed the nurse to dump out all the bottles of Tegretol, except for two in case of emergency. Neither nurse ever saw Jennifer suffer from a seizure.
There is evidence from a comparison of Jennifer's medical records, that on fourteen occasions Bush made misrepresentations in her reports to medical staff and doctors about Jennifer's medical history. See Appendix B. For example, on one Monday Bush reported to Dr. Deleo that Jennifer was well all weekend, but on that same day reported to Dr. Rabinovitz, Jennifer's psychologist, that Jennifer vomited all weekend. On another occasion Bush predicted the onset of symptoms that Jennifer eventually developed.[2]
Jennifer was removed from Bush on April 15, 1996. By this time, Jennifer had been hospitalized for a total of 640 days, had undergone 40 medical procedures, and had undergone 1,819 non-surgical treatments. Medicaid had paid over $1 million to Coral Springs Medical Center and Hollywood *113 Memorial Hospital on account of Jennifer's hospitals bills.
Jennifer was immediately sent to the Children's Hospital in Cincinnati, Ohio. Upon arrival, Dr. Colin Rudolph decided to remove Jennifer's feeding tube and port-a-cath and see how Jennifer fared on her own. In his opinion, aside from Bush's reports of sickness, there was no objective data in Jennifer's medical records to support the need for the tubes. The outcome was that Jennifer was able to eat food without any problems, was "totally well," and displayed no gastrointestinal disorders.
Dr. Rudolph opined that there was no medical explanation for the change in her health and that the Dr. Flores diagnosis of neuropathic motility disorder was incorrect. The improvement had to be based on an external factor, such as misleading symptom reports that caused doctors to perform unnecessary procedures. In his opinion, 90% of a doctor's diagnosis and decisions for testing and treatment of a child are based upon medical histories received from the parents.
Jennifer left the Cincinnati hospital to live at a foster home, free from tubes and all medications. Her current pediatrician testified that since the separation from Bush, Jennifer's health was "very good." A witness who visited Jennifer weekly after separation from Bush thought Jennifer looked very good, healthy, athletic and energized, having regained a healthy appetite. She suffered from no intestinal problems, no infections, and had not been hospitalized since the separation.
In Doctor Eli Newberger's opinion, all of Jennifer's illnesses and symptoms were identical to those of a patient with toxic Tegretol levels. The doctor also noticed a pattern that many of the suspicious incidents reported by the nurses, such as increased rates in feeding and IV pumps and submission of contaminated urine samples, occurred within a few days of Jennifer's scheduled discharge dates.
Doctor John Wright, a pediatrician and Director of the Broward County Child Protection Team, concluded that most of Jennifer's medical problems were the result of "Chronic Fabricated Illness." Jennifer's illnesses were either caused, fabricated, exaggerated, or made worse by the efforts of a person trying to get her to appear ill. He based his conclusion on the following facts:
(1) Jennifer's ailments involved multiple organs contrary to normal diseases which affect only one system at a time;
(2) Jennifer's sicknesses were bizarre: e.g., three instances of polymicrobial sepsis and one instance where a urinary tract infection was caused by a lactobacillus bacteria, not likely to cause a female infection since it is an immobile organism;
(3) no treatments seemed to work and no medical explanation was ever discovered for Jennifer's reported problems;
(4) Bush had made medical misrepresentations to doctors;
(5) there were indications of foul play such as Jennifer receiving Tegretol although the drug was on hold, Bush presenting contaminated urine samples, and IV and feeding pumps mysteriously malfunctioning; and
(6) after Jennifer was removed from Bush she thrived and became healthy.
Dr. Wright explained that most of a doctor's diagnoses and the treatments prescribed for a child are based on the reports of the child's parents. He noted seven occasions when Bush's reports to doctors were inconsistent with the doctor's physical findings of Jennifer's health upon examination. See Appendix C. Thus, Dr. Wright concluded that Jennifer had been *114 subjected to numerous, ineffective and unnecessary diagnostic tests caused by Bush's persistent and repetitive exaggeration and fabrication of Jennifer's illnesses, which physicians acted upon.
In Bush's defense, her twenty year old son, Jason, testified that he saw Jennifer have a few seizures at home. According to Jason, Jennifer would inform him she was going to have a seizure, scream "I'm falling," close her eyes, and "like tremble" from 5-25 minutes. Contrary to earlier testimony, Jason stated that Dr. Deleo was present during a couple of seizures.
Mary Blank, a nurse who cared for Jennifer at both Hollywood Memorial Hospital and at home, believed Bush was a victim of hospital rumors and nurse fabrication. She stated that she would often see Jennifer play with her tubing sometimes without clean hands, which could cause internal infection. She had also seen Kangaroo feeding pumps, the type used for Jennifer, malfunction on their own. Blank had once observed Jennifer display seizure symptoms, a mild twitching on one side of her body with eyes deviating to one side. Another nurse, Robin Helfan, testified she saw Jennifer display ataxic behavior while Bush was not home, saw Jennifer manifest staring spells indicative of a petit mal seizure, and has seen Kangaroo feeding pumps malfunction on their own.
A doctor in pharmacology compared the times Bush was present during the Tegretol hold period in May-June 1990, with the times of toxic level readings, and concluded Bush was not present when the Tegretol was administered to Jennifer. This conclusion was based upon his estimate of the drug's absorption rate, which disagreed with the rate specified by the State's pharmacist.
The defense also called Dr. Mario Tano, Jennifer's fourth pediatric-gastroenterologist, who cared for her after Dr. Flores diagnosed Jennifer with the motility disorder. Dr. Tano agreed with Dr. Flores' diagnosis. On cross examination, Dr. Tano admitted he found it "bizarre" that Jennifer's health improved so drastically once removed from Bush and had no explanation for the improvement. Dr. Tano never experienced a feeding pump accelerate or move fluid backwards. By the time cross-examination concluded, Dr. Tano admitted that with all he was aware of now, he was no longer sure whether Jennifer ever had a gastric intestinal disorder.
The defense finally called Dr. David Drucker, a pediatric surgeon who operated upon Jennifer once during the unavailability of Dr. Birken, the surgeon who had usually installed her feeding tubes and performed maintenance upon these tubes. In Dr. Drucker's opinion, Jennifer had suffered from a chronic intestinal pseudo obstruction, a self-intestinal obstruction of bowel. This disorder could cause joint aches and, because of the required feeding tubes, increase the chances of suffering from sepsis and intestinal infections. Dr. Drucker also believed polymicrobial sepsis was common in children with this type of disorder.
Dr. Drucker's opinion differed from Dr. Rudolph's opinion, the doctor who cared for Jennifer in Cincinnati, Ohio. In Dr. Rudolph's opinion, at no time had Jennifer suffered from an intestinal pseudo obstruction syndrome. In fact, only 4-7 individuals in the country suffer from such a disorder. Dr. Rudolph is the Director of the Children's Hospital Feeding Team, which serves as a national and international referral base for children with complex disorders in feeding, swallowing, and intestinal functioning.
After nearly two days of deliberation, the jury found Bush guilty of both counts as charged. The trial court sentenced *115 Bush to concurrent terms of five years imprisonment followed by five years probation. This appeal timely followed.
Bush first argues that she was entitled to a jury interview. At trial, over 33,000 documents were admitted into evidence en mass in boxed groups from the various medical practitioners providing services for Jennifer. Not every document was actually published to the jury during trial, however; only those requested by a party or directed by the trial court were made known to the jury. Before deliberation, the parties discussed which records would actually be sent into the jury room for review. The state initially requested that all 33,000 documents be submitted, but Bush objected on the grounds that some of the documents in the boxes were privileged. The court agreed and ruled that only those documents shown in open court could be given to the jury.
We pause to note that the determination as to what evidence should be placed in the jury's hands is within the trial court's discretion. See Fla. Power & Light Co. v. Robinson, 68 So.2d 406, 413 (Fla.1953) (documents to be submitted to jury during deliberations is matter of discretion); Darley v. Marquee Enters., Inc., 565 So.2d 715, 720 (Fla. 4th DCA 1990) ("a trial court does have discretion in determining which exhibits may be sent to the jury room"). We would review such a determination only for an abuse of discretion. See Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) (discretion is abused only where no reasonable person would take the view adopted by the trial court).
The trial court thereupon instructed both parties to go through the documents and extract only those used in open court during trial. The next day, Bush withdrew any objection and proposed that all 33,000 documents, except for those deemed privileged, be given to the jury. The court stood by its earlier ruling, however. Soon afterward the parties agreed in open court upon two volumes of documents to be given to the jury. These two volumes contained the documents about which Bush now complains.
After trial, in a sworn motion seeking a jury interview and new trial, Bush's attorney attested that after the jury rendered its verdict a juror told him that three letters were included within the documents placed in the jury room even though the letters were not published in open court. The letters in question are handwritten requests from Bush to Jennifer's doctors that Jennifer's private medical records not be disclosed to the state or its agency, HRS, but only to Bush's attorney. The attorney represented that the juror stated that the letters had a definite effect on his deliberations and final vote of guilt and that he considered the letter to be direct proof of Bush's consciousness of guilt. Bush's counsel explained that although he and Bush herself combed through the records to be submitted to the jury during deliberation, both overlooked the letters described by the juror and they should not have been given to the jury. The trial court denied the motion to interview the jury, finding that Bush waived any objection by specifically agreeing in court as to the documents to be placed into the jury room.
A trial court's denial of a motion to interview the jury is also subject to review only for an abuse of discretion. Shere v. State, 579 So.2d 86, 95 (Fla.1991). A jury interview is permissible only where the moving party has made sworn factual allegations that, if true, would require a trial court to order a new trial. Baptist Hosp. of Miami, Inc. v. Maler, 579 So.2d 97, 100 (Fla.1991); Duchainey v. State, 736 So.2d 38, 39 (Fla. 4th DCA 1999). A new *116 trial could be warranted if the jurors considered unauthorized materials affecting their verdict. Duchainey, 736 So.2d at 39; Sayih v. Perlmutter, 561 So.2d 309, 312 (Fla. 3d DCA 1990) ("It is generally reversible error to deliver to the jury room any materials which have not been admitted into evidence where the materials are of such character as to influence the jury."); see also State v. Hamilton, 574 So.2d 124, 130 (Fla.1991) ("[A] hearing is unnecessary if the allegations, taken as true on their face, had no reasonable possibility of affecting the verdict."). A matter may affect the jury's verdict if it relates to the issues at trial and the jury consulted it to reach their verdict. Compare Duchainey, 736 So.2d at 39 (reversing for jury interview where photocopied pages from unauthorized dictionary were found in deliberation room with certain words highlighted that were specific to the charges against the defendant and applicable to the jury instructions); Snook v. Firestone Tire & Rubber Co., 485 So.2d 496 (Fla. 5th DCA 1986) (remanding for jury interview where defendant's affidavit alleged that one juror conducted an independent investigation during trial and reported to the other jurors in the trial that evidence presented at trial was incorrect), with Ackerman v. State, 737 So.2d 1145, 1148 (Fla. 1st DCA 1999) (affirming denial of mistrial although a Bible was wrongfully in jury deliberation room because no juror consulted the book); Hatcher v. State, 679 So.2d 27, 28 (Fla. 4th DCA 1996) (sentencing recommendation of jurors would not be set aside although extra verdict forms were found in deliberation room because no evidence that forms influenced jury); Carr v. State, 689 So.2d 283, 286 (Fla. 3d DCA 1996) (finding error harmless where defendant's written statement that she was inappropriately portrayed in America's Most Wanted television show was erroneously given to jury during deliberations because jury discovered from statement only that defendant denied liability for crimes, a fact as to which they were already aware).
We affirm the denial of the jury interview. First, the record supports the trial court's finding that Bush herself waived any objection to the documents being seen by the jury. The parties were designated to select the jury's documents from the 33,000 admitted in evidence. The court relied upon the agreement of the parties that the documents specified could be placed into the jury room. Bush and her attorney personally reviewed the documents in question and advised the court that those submitted were acceptable for submission to the jury. It was only after the verdict of guilty that Bush claimed that some of the documents she previously accepted were unacceptable. The trial judge's denial of relief is certainly consistent with a finding that the post-verdict claim of inadvertence is too opportunistic.
Thus, unlike Sayih v. Perlmutter, 561 So.2d 309 (Fla. 3d DCA 1990), this is not an instance of submission to the jury as a result of another's mistake, but is instead one where Bush herself took the action which led to the letters being included within the evidence placed into the jury's hands during deliberation. Bush herself was responsible for the letters being given to the jury; she therefore waived her objection to their submission. See, e.g., Jenkins v. State, 732 So.2d 1185, 1187 (Fla. 4th DCA 1999) ("If appellant knew of the problem at the time [the extrinsic evidence was given to jury], his failure to call it to the court's attention precludes him from raising it in the motions for new trial and for jury interview.").
Additionally, the trial court's denial of relief is justified by its conclusion that the letters in question did not necessarily *117 have the effect attributed to them in Bush's argument. To allow for an interview of jurors, the proponent of the interview must necessarily show that the claimed impropriety would obviously have the effect of unfairly affecting jury deliberations. This trial took place over several months. There was a veritable mountain of evidence adduced, by far the greatest part of which was in the nature of medical evidence. The state's case lay essentially in the medical evidence and the documented conduct of Bush. The trial court's denial of a jury interview is consistent with Bush having simply failed to demonstrate to the trial court's satisfaction that the subject letters plausibly affected the jury's ultimate conclusion. In this regard we cannot say that the trial court abused its discretion.
Bush's second argument on appeal asserts a new trial is warranted due to the prosecutor's remarks during closing argument. She alleges that four times the prosecutor improperly shifted the burden of proof and one time made an improper character reference. We find the cumulative effect of the remarks does not warrant a new trial and that the trial court, therefore, did not abuse its discretion in denying Bush's motions for mistrial. See Ferguson v. State, 417 So.2d 639, 641 (Fla. 1982) (within sound discretion of trial judge whether to grant motion for mistrial but such discretion should be exercised only when error during trial is "so prejudicial and fundamental that the expenditure of further time and expense would be wasteful if not futile"); see also Canakaris, 382 So.2d at 1203 (discretion is abused only where no reasonable person would take the view adopted by the trial court).
Of the four alleged burden-shifting comments, in response to three the trial court provided curative instructions, again reminding the jury that the state carried the burden of proof. During its preliminary instructions the court had initially instructed the jury as to the state's burden of proof. With the repetition of this instruction, it cannot be suggested that the state's argument did anything to make the jury believe that the burden was otherwise. Thus, the remarks were not harmful. See, e.g., Thomas v. State, 726 So.2d 369, 372 (Fla. 4th DCA 1999) (explaining that a prosecutor's comment that the defendant has failed to call a witness is improper but does not mandate per se reversal, and holding that although such error occurred, trial court was correct in denying motion for mistrial because after state's comment the trial court provided a curative instruction thereby removing any prejudicial taint).
As to the remaining two alleged improprieties, Bush failed to preserve her objections for review. Bush did not object to the fourth burden-shifting comment. See Castor v. State, 365 So.2d 701, 703 (Fla.1978) (holding that contemporaneous objections are required to preserve argument that state made improper remark during closing argument). Similarly, Bush failed to secure a ruling on her objection to the character reference and failed to move for a mistrial. See Schreidell v. Shoter, 500 So.2d 228, 233 (Fla. 3d DCA 1986) ("Failure to secure a ruling on an objection waives it, unless the court deliberately and patently refuses to so rule."); LeRetilley v. Harris, 354 So.2d 1213, 1214 (Fla. 4th DCA) (same), cert. denied, 359 So.2d 1216 (Fla.1978); see also Duest v. State, 462 So.2d 446 (Fla.1985) (explaining that where objection is sustained party must also move for mistrial in order to preserve issue for appellate review).
Still, the failure to preserve an objection to closing argument remarks will not preclude review where the comments were so prejudicial as to constitute fundamental *118 error. Street v. State, 636 So.2d 1297 (Fla.1994). Prosecutorial argument rises to the level of fundamental error when the argument taken as a whole is "of such a character that neither rebuke nor retraction may entirely destroy [its] sinister influence." Ryan v. State, 457 So.2d 1084, 1091 (Fla. 4th DCA 1984), review denied, 462 So.2d 1108 (Fla.1985). In other words, the cumulative effect of all the prosecutor's errors must be of such a prejudicial magnitude that the defendant was denied a fair trial. Nowitzke v. State, 572 So.2d 1346, 1350 (Fla.1990); Barnes v. State, 743 So.2d 1105, 1108 (Fla. 4th DCA 1999). Here, the State's errors were not of such a prejudicial magnitude that Bush was denied a fair trial. The prosecutor's character reference was obviously designed to suggest that the jury not guess at Bush's motives for abusing her child. When this argument was made, Bush's counsel himself thought so little of any possible sinister meaning that he did not move for a mistrial. In response to three of the alleged improper burden-shifting comments, the trial court provided curative instruction in an abundance of caution. The remaining comment was a valid response to Bush's comments during opening statements. Finding no fundamental error, we are unable to agree that a new trial is warranted.
Bush next argues that she is entitled to a new trial as a result of two prosecutorial remarks during its opening statement. The purpose of opening statements is to outline what an attorney expects the evidence will establish, and control of opening statements is within the trial court's discretion. Occhicone v. State, 570 So.2d 902, 904 (Fla.1990). The prosecutor's first comment was a proper outline of what the prosecutor expected to establish by the evidence. At trial, Dr. Wright testified that he was consulted by HRS to evaluate whether this was a case of child abuse and concluded that most of Jennifer's medical problems were the result of chronic fabricated illness.
The prosecutor's second comment, that Dr. Deleo fired Bush from his employment, was not a proper outline of what the prosecutor expected to establish by the evidence, however. The evidence at trial showed only that Bush ceased working for Dr. Deleo in 1993 and not that Bush was fired by Dr. Deleo. Thus, the trial court properly sustained Bush's objection to the comment. See, e.g., Rivera v. State, 745 So.2d 343 (Fla. 4th DCA 1999) (testimony that defendant was discharged from the army for sexual harassment was improper collateral crimes evidence). The court also properly exercised its discretion in denying Bush's motion for mistrial. A mistrial should be granted only when an error during trial is "so prejudicial and fundamental that the expenditure of further time and expense would be wasteful if not futile." Ferguson v. State, 417 So.2d 639, 641 (Fla.1982). The prosecutor's remark did not rise to that level. Whether Bush was fired from Dr. Deleo's employment or simply quit was not a pivotal matter in the case, which revolved around months of medical testimony. Also, the trial court sustained Bush's objection, thereby alerting the jury to disregard the comment. Moreover, before opening statements the trial court explained to the jury that what the lawyers say during opening statements is not evidence. Thus, the remark did not deprive Bush of a fair trial.
Bush also argues that a new trial is warranted because the trial court permitted the state to present a rebuttal witness to discredit a defense witness. One of the two nurses to testify in Bush's favor, Mary Blank testified that she believed Bush was a victim of hospital rumors and *119 nurse fabrication, as she never observed any abuse of Jennifer. On cross examination, the state asked Blank whether just after she started working for Bush she contacted her supervisor and asked to not work at the Bush home anymore because Bush was abusing her child. Blank stated that event did not happen and was untrue. She left Bush's employment because she quit working for the home nursing agency. In rebuttal and over Bush's objection, the state presented the testimony of Blank's supervisor, who said that Blank asked to be removed from the Bush's home because Blank "felt uncomfortable" and believed "something was going on." Upon this request, Blank was removed from the Bush home.
We find no error. Section 90.608(5), Florida Statutes (1999), states that any party may attack the credibility of a witness by offering another witness to present proof that material facts are not as testified to by the witness being impeached. See, e.g., C.M. v. State, 698 So.2d 1306, 1307 (Fla. 4th DCA 1997) (finding no error where state called officer to testify he had encountered defendant earlier that day to rebut defendant's testimony that he had not encountered the officer). A trial court's decision to permit a party to offer rebuttal testimony is subject to an abuse of discretion standard of review. Cruse v. State, 588 So.2d 983, 990 (Fla.1991); Winn-Dixie Stores, Inc. v. Sheldon, 184 So.2d 667, 668 (Fla. 4th DCA 1966). We find no abuse of discretion in permitting rebuttal evidence to Blank's testimony.
Bush also asserts that a new trial is warranted because two state expert witnesses improperly gave an opinion as to Bush's guilt. A witness may not provide his or her opinion as to the guilt or innocence of a criminally accused. Martinez v. State, 761 So.2d 1074, 1079 (Fla.2000) (explaining that although section 90.703 permits opinion testimony on an ultimate issue to be decided by the trier of fact, opinion of the defendant's guilt is precluded under section 90.403).
Here, the expert witnesses did not offer such improper opinion, however, but simply pointed out numerous instances where Bush's reports to doctors did not match the doctor's physical findings upon examination of Jennifer. The witnesses concluded that Bush's reports were "inconsistent" with the doctors' physical findings. This conclusion was not a stated opinion of Bush's guilt of child abuse or fraud but a medical conclusion as to the comparison of the objective findings with complaints voiced by Bush. § 90.703, Fla. Stat. (1999) ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it includes an ultimate issue to be decided by the trier of fact."). See, e.g., Hamilton v. State, 696 So.2d 914, 915 (Fla. 2d DCA 1997) (in DUI manslaughter case, expert's opinion that defendant was driving eastward was not an opinion of guilt but a permissible opinion based upon the physical evidence available to the jury).
Last, Bush argues that a new trial is warranted because the trial court permitted a lay witness to opine that Jennifer was healthier since removal from Bush's care. Again, we find no error.
A trial court has discretion with regard to the admissibility of evidence that is capable of differing interpretations, and its rulings in this regard will not be disturbed unless discretion has been abused. See Maggard v. State, 399 So.2d 973, 975 (Fla.), cert. denied, 454 U.S. 1059, 102 S.Ct. 610, 70 L.Ed.2d 598 (1981); D.F. v. State, 730 So.2d 384 (Fla. 4th DCA 1999). A lay witness may describe a person's physical appearance using opinions *120 that do not require special skill, so long as the opinions are based upon observations of the witness. Fino v. Nodine, 646 So.2d 746, 749 (Fla. 4th DCA 1994) ("Before lay opinion testimony can be properly admitted, a predicate must be laid in which the witness testifies as to the facts or perceptions upon which the opinion is based."); § 90.701, Florida Statutes (1999); see, e.g., Hixon v. State, 165 So.2d 436, 441 (Fla. 2d DCA 1964) (a lay witness may give opinion as to sanity if the opinion is based upon relevant facts and circumstances known to and detailed by him).
Here, the lay witness did not testify that Jennifer seemed "healthier," which would have been improper because he did not know Jennifer during her care with Bush. Instead the witness stated that her current health was good:
"I would describe [her health since separation from Bush] as generally very good. Very positive in the sense of showing a great deal of robust vitality. She is a very athletic child. She is very energized. Has a very healthy appetite. Looks wonderful. She has changed her appearance and gotten taller and has a very complementary complexion and."
Thus, the lay opinion was admissible because it was based upon conditions actually perceived and is an opinion not requiring special knowledge or skill.
AFFIRMED.
STONE and HAZOURI, JJ., concur.
APPENDIX A
Nurse Reports
1. Nine nurses testified that on numerous occasions, Bush, after visiting with Jennifer alone in Jennifer's private hospital room, would report to the nurses that Jennifer had vomited. When the nurse would ask to see the sample, Bush would explain she had already discarded it. The nurse would look around the room and see no evidence of vomit, however, and smell no odor of vomit in the room or on Jennifer's breath. The nurse would ask Bush to please keep the sample next time because it was important for the nurses to document the event in the medical records. Bush would not adhere to the plea but continue the pattern.
2. One nurse reported that on a morning of Jennifer's hospital stay, Jennifer was playing and seemed happy. Jennifer was receiving nutrients through her G-tube but had not been fed that day. While Bush was visiting Jennifer alone in Jennifer's private room, Bush called the nurse to inform her that Jennifer had vomited. The nurse found stomach fluids in Jennifer's emesis basin but determined that the fluid came from Jennifer's G-tube, rather than up through her mouth, and found the incident curious since there should have been nothing in Jennifer's stomach to drain out of the tube.
3. A minimal amount of drainage from a G-tube is normal, but during Bush's visits, one nurse noticed that the drainage would be ten times the normal amount.
4. Bush would often collect Jennifer's urine samples for testing. One time, a nurse recalled that Bush presented a sample that looked cloudy and sludgy. The nurse did not see Bush collect the sample. After Bush left, the nurse collected her own sample, using the sterile techniques nurses are trained to use. The second sample was clear and pure. Bush had been previously instructed on the *121 proper sterile technique to collect urine.
5. Another nurse would on occasion hear Jennifer saying "no, no" or "I don't want that," or "no more" but when the nurse would enter the room, she would not see anything out of the ordinary and Bush would provide some explanation of why Jennifer was saying those remarks.
6. On days Jennifer was being prepared to be discharged from the hospital, Bush would visit Jennifer in her private room and inform the nurses that Jennifer "just had a seizure" and could not return home. The nurses would not observe the seizure, but Jennifer's discharge would be canceled for precautionary measures.
7. Another nurse remembered Bush yelling from Jennifer's private room that Jennifer was having a seizure. When the nurse entered the room she saw no indication of a seizure.
8. On a day that Jennifer was scheduled to be discharged from the hospital, Jennifer was being administered TPN intravenously. The nurse initially set the IV pump at a rate of 40 cc per hour. Bush visited with Jennifer, and shortly thereafter the nurse found the pump reset to 50 cc per hour without explanation.
9. In April 1991, a nurse saw Bush administer medication to Jennifer through the J-tube without the nurse's consent. Soon thereafter, Jennifer complained of abdominal pain and passing flatus.
10. In May 1991, a nurse recorded that Jennifer was playing in the hospital playroom without incident. Bush visited her there and soon reported to the nurse that Jennifer threw up and handed the nurse a cup containing liquid. The nurse noticed that the substance did not smell like vomit and had no drippings on the side of the cup, although children are usually messy when they vomit. The nurse checked on Jennifer and found her to be well. When the nurse asked Jennifer if she threw up, Jennifer answered "no" and that Bush had taken the liquid out of her G-tube.
11. One nurse who cared for Jennifer at home could not find an emesis pan in the Bush house which she thought was curious being that Bush reported that Jennifer suffered from chronic vomiting for so long.
12. On November 27, 1992, the day before Jennifer's scheduled discharge, Bush visited with Jennifer while she received antibiotics intravenously. The two walked down the hall together with Jennifer's IV antibiotic bag on wheels. At 7:50pm, the attending nurse stopped to check on Jennifer and found her IV pump was turned off. Bush told the nurse she was unaware the pump was off and the nurse turned it back on. Forty minutes later, the nurse found the pump again turned off. The nurse believed the pump had been turned off for a while because Jennifer's blood had noticeably backed up into the IV tubing. When the nurse asked how the pump again turned off Bush responded, "I don't know, maybe we bumped it by accident." Bush was the only person with Jennifer during this event. The nurse instructed Bush on how to detect if the pump was off and again left the two alone together. Jennifer returned *122 to her room with Bush and the nurse checked on Jennifer at 9:30pm and saw that the pump was working fine. The nurse returned to her station and at 9:45 Bush stopped by to say that she was leaving. When the nurse checked on Jennifer at 10:00pm, she found the IV pump was turned off for the third time. The nurse reset the pump and it operated throughout the night without incident. Seven of Jennifer's nurses, some with more than twenty-five years of experience, testified that they never had an IV pump turn off by itself.
13. On February 13, 1993, a Kangaroo feeding pump was attached to Jennifer's G-tube to regulate the amount of liquid food flowing through the tube. As ordered by Dr. Deleo, a nurse set Jennifer's pump to feed 8 cc per hour of liquid while Bush was visiting with Jennifer. When the nurse later entered the room, the pump was increased to a rate of 255 cc per hour. The rate increase was easily noticeable. Jennifer vomited, complained of nausea, and had diarrhea. The incident occurred two days prior to Jennifer's scheduled discharge from the hospital. None of Jennifer's nurses had ever before experienced a feeding pump speeding up on its own, even nurses with more than twenty-five years of experience. No nurse ever saw Jennifer tamper with her own medical equipment.
14. Again on April 15, 1995, a nurse found Jennifer's feeding pump accelerated. The nurse originally set the pump at 10:00pm at a rate of 40 cc per hour with 280 cc of Vivanex in the feed bag. Bush entered Jennifer's room carrying a shopping bag and the nurse left the two alone. Bush closed the hospital room door. At midnight, the nurse returned to check on Jennifer who was sleeping and found the pump operating at a much faster speed. The increased pump rate was easily noticeable yet Bush did not alert the nurses to it. The amount of fluid in the feed bag had also increased to 325 cc. The nurse reset the pump to 40 cc per hour and reported the incident to her nurse manager but because HRS was investigating Bush, the manager instructed the nurse to not arouse suspicions. The nurse returned to the room and now found the feed bag emptied to 250 cc. At the rate of 40 cc, that much fluid should not have pumped through already. The incident caused Jennifer's scheduled discharge to be delayed. Prior to and after the incident, the kangaroo pump operated without malfunction. Jennifer's nurses testified that they never saw a Kangaroo pump move fluid backwards out of a tube and that such movement would be impossible.
15. On January 23, 1995, Jennifer's nurse started Jennifer's Kangaroo pump at a rate of 15 cc per hour with 200 cc of Vivanex in the feeding bag. Jennifer had been feeling fine all day. Bush arrived to visit and the nurse left the two alone in Jennifer's hospital room. A half hour later, Bush reported to the nurse that the feed bag was empty. The Vivanex should have lasted all night. The nurse checked the pump and saw that it was set at the same rate. The nurse saw no fluids *123 on the floor, so presumably all the Vivanex went inside Jennifer. Soon thereafter Jennifer complained of nausea and vomited. The incident occurred the night before Jennifer's scheduled discharge.
16. On March 12, 1995, Bush reported to the attending nurse that Jennifer was complaining of pain while urinating and asked the nurse to get doctor approval for the taking of a urine sample. While the nurse was calling the doctor, Bush presented a sample she said she collected herself. The nurse still took her own sample upon receipt of the doctor's order. Bush asked the nurse why she was taking a second sample and the nurse explained that she wanted to ensure the sample was taken with use of sterile procedures. Bush did not seem to be pleased that the nurse was taking a second sample. When the nurse asked Jennifer about the pain, Jennifer denied having pain while urinating. Later, while the two samples were sitting at the nurse station waiting to be sent to the lab, one nurse saw Bush fondling the bagged samples. When Bush noticed the nurse seeing her, Bush asked whether they were Jennifer's samples and then engaged in chit chat. This event occurred the day before Jennifer was scheduled to be discharged. When the samples were compared, Bush's sample contained blood, mucus, and bacteria while the nurse's sample was pure. Bush's sample could be interpreted as a urinary tract infection. When the nurse told Bush about the results, Bush explained that she collected her sample from the Johnny Pot (basin used as toilet to collect samples of Jennifer's stool and urine). Bush had not mentioned that she collected the sample from the pot before.
In a doctor's expert opinion, the results were so different that they were likely from two different people or one was purposefully contaminated. The doctor also believed Bush knew how to collect a sterile sample, and knew not to use the Johnny Pot, as she had many times collected samples properly and had complained of nurses not taking sterile samples herself.
17. One time, a nurse recalled Jennifer telling her, "I'm having a seizure," but Jennifer was clearly not.
18. Bush owned a specialized wheelchair for Jennifer, one similar for use by Cerebral Palsy patients. She sometimes brought it to the hospital. Jennifer had no mobility problems, though.
APPENDIX B
Evidence of Medical Misrepresentations
1. Bush told an at home nurse that she had seen Jennifer suffer from petit mal seizures (staring spells) and that the hospital nurses witnessed Jennifer have grand mal seizures (epileptic type seizure). Bush told a second home nurse that she never witnessed Jennifer have a seizure.
2. Bush once reported that Jennifer's ailments must be the result of Bush having been exposed during pregnancy to a cyanide spill. The report was made only one time and never mentioned again.
3. Bush told Jennifer's immunologist, Dr. Robert Nelson, that Jennifer's older brother one time was diagnosed with an immune deficiency for six months. Bush told Dr. Gadia *124 that Jennifer's older brother had no history of health problems.
4. June 3, 1989, Jennifer was at Coral Springs Medical Center receiving gamma globulin injection for immunodeficiency. The nurse's notes from that morning state Jennifer awoke alert, active, and well. All vital signs stable. Bush reported to Dr. Deleo, however, that Jennifer awoke ataxic.
5. April 9, 1990, after the home care nurse left for the day, Bush rushed Jennifer to Coral Springs Medical Center reporting that Jennifer was vomiting daily. The home care nurses' notes report that Jennifer vomited only once between April 4th through 9th.
6. April 12, 1990, after the home care nurse left for the day, Bush rushed Jennifer to the hospital reporting to Dr. Deleo that Jennifer was vomiting daily. The home care nurses' notes for April 11-12 report no vomiting.
7. October 24, 1990, Bush reported to Dr. Rabinovitz, Jennifer's psychologist, that Jennifer was screaming about unrelenting stomach pain. Jennifer had visited the nurses at Coral Springs Medical Center on October 23, however, and the nurses made no report of pain but found Jennifer to be playful and cheerful. Jennifer had also visited Dr. Deleo on October 22, and no report of abdominal pain was made.
8. January 22-29, 1991, Jennifer was at Coral Springs Medical Center and no seizure activity was observed. On January 30, Bush reported to Dr. Rabinovitz that Jennifer had a difficult week with lots of seizures.
9. May 8, 1991, Bush reported to Dr. Gadia that Jennifer was suffering from diarrhea twice a day for last two days. Home care nurse notes from last two days report no diarrhea. Jennifer also visited Dr. Deleo on May 6 and no diarrhea was reported.
10. December 4, 1991, Bush reported to her home care nurse that the day before Jennifer turned blue during a doctor visit and Dr. Deleo said she had a possible seizure. Dr. Deleo's notes from the day before, however, logged no problems.
11. December 20, 1991, Bush admitted Jennifer into hospital with diagnosis of sepsis. Upon admission, Bush told the admitting receptionist that she was a nurse taking care of Jennifer at home.
12. February 10, 1992 (Monday), Bush reported to Dr. Deleo that Jennifer did not vomit or have diarrhea all weekend. The same day, Bush reported to Dr. Rabinovitz that Jennifer suffered from long series of violent seizures and bowel obstruction the day before.
13. November 5, 1992, Jennifer was admitted to a hospital in Tennessee while the Bush family was on vacation. Jennifer's Tegretol level was toxic, at 19.5%. Bush explained to a nurse that Jennifer's normal baseline is 15%. However, Dr. Gadia told Bush Jennifer's level should always be within 4-10%. Bush also reported to the Tennessee medical staff that Jennifer has been having seizures since the age of three, mild at first but now grand mal seizures (full epileptic seizure).
14. June 4, 1993, Jennifer was at Hollywood Memorial hospital. The nurse reported that at 2am, Jennifer *125 awoke crying, shivering, and vomiting with a temperature of 103.2. By 6:30am, Jennifer was normal and awake. Bush reports to Dr. Rabinovitz that Jennifer had bad seizures all last night.
APPENDIX C
A Comparison of Evidence as to Complaints Made by Bush With the Results of Doctor's Examination
1. Bush admitted Jennifer into the hospital claiming dehydration and diarrhea. Nurse notes showed no bowel movement for 10 hours and it was formed, not loose.
2. A number of times Bush would report respiratory distress and wheezing, but the doctor would find no abnormalities.
3. On August 17, 1988, Bush brought Jennifer to a pediatric gastroenterologist, Dr. Lawrence Adams, alleging chronic diarrhea for last five weeks. Adams performed an abdominal examination and found bowel normal. Weight also normal.
4. February 7, 1989, Bush takes Jennifer to another gastroenterologist, Doctor Daniel McClenathan. Bush reports to McClenathan that Jennifer is having six to eight stools a day for last four months and that she lost two or three pounds. McClenathan performed a physical exam and found Jennifer to be of normal weight (described her as "chubby"), active, alert and in no acute distress.
5. September 27, 1989, Jennifer undergoes a video EEG (records electrical activity of brain). Bush watches over Jennifer during test and reports to Dr. Gadia that at one time Jennifer's left foot had a slight tremor lasting for 10-15 seconds. Video did not show the tremor.
6. In July 1989 and January 1990, Bush reports to Dr. Gadia that she has observed in Jennifer several prolonged episodes of ataxia separated by periods of lethargy. Also one episode where Jennifer's body on the left side was jerking. All of Dr. Gadia's neurological examinations of Jennifer were negative for abnormalities.
7. October 24, 1990, Bush reports to Dr. Rabinovitz, Jennifer's psychologist, that Jennifer is screaming about unrelenting pain. Upon her visit that day, however, Rabinovitz finds Jennifer to be "bright," "very glad" to see him, and playful. When asked about pain, Jennifer avoids discussion.
NOTES
[1] One nurse reported in her nursing notes, however, that on July 22, 1992, she observed Jennifer have a tonic clonic seizure (repetitive rhythmic movement of limbs).
[2] On August 5, 1991, Jennifer was in the hospital, and Bush reported to Dr. Rabinovitz, Jennifer's psychologist, that Jennifer would be required to stay at the hospital for the next couple of weeks. On the next day, Dr. Deleo visited Jennifer at the hospital and reported her as doing great, looking wonderful, with increased weight and likely to be discharged within the next two days. But at 5:55pm that night, Bush reported to the nurse that Jennifer was complaining that her head was spinning. Jennifer's Tegretol level was tested showing a toxic level of 18.49%. Dr. Deleo could find no explanation for the increased level. The level spiked again the next day to 18%. Dr. Deleo did not allow Jennifer to be discharged as planned.